# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 3, 2014 Session

## SHAWN HATCHER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**Nos. 01-09093-95      W. Mark Ward, Judge**

---

**No. W2013-01767-CCA-R3-PC - Filed November 20, 2014**

---

The petitioner, Shawn Hatcher, appeals the denial of his petition for post-conviction relief, arguing that his trial counsel was ineffective for not putting on expert proof to support his defense theory of diminished capacity and that the post-conviction court erred by relying on Denton v. State and Black v. State to deny his petition on the basis that he failed to present the expert witness' proposed trial testimony at the evidentiary hearing. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, J., joined. JEFFREY S. BIVINS, J., Not Participating.

Samuel Rodriguez, III, Memphis, Tennessee, for the appellant, Shawn Hatcher.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Meghan Fowler, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In 2005, the petitioner was convicted by a Shelby County Criminal Court jury of first degree felony murder, first degree premeditated murder, and two counts of attempted first degree murder based on his participation with his older brother and two other men in a shooting that resulted in the death of one victim and the serious injury of two others. State v. Shawn Hatcher, No. W2006-01853-CCA-R3-CD, 2008 WL 4071829, at *1 (Tenn. Crim. App. Aug. 29, 2008). After merging the first degree murder convictions, the trial court

sentenced the petitioner to life imprisonment for the first degree murder conviction and to fifteen years for each of the attempted murder convictions, with the fifteen-year sentences to be served concurrently to each other but consecutively to the life sentence. Id. This court affirmed the convictions on direct appeal, see id., as did our supreme court after granting the petitioner's application for permission to appeal. See State v. Hatcher, 310 S.W.3d 788, 793-97 (Tenn. 2010).

Our supreme court's opinion contains the following summary of some of the evidence presented at trial:

> This case arises from [the petitioner's] participation in the shooting death of Marcel Mackey and the gunshot injuries to Anitra Flowers and Randall White/Moore ("Red") on April 3, 2001, in Memphis, Shelby County, Tennessee. [The petitioner] was charged with alternative counts of first degree premeditated murder and first degree felony murder, and two counts of attempted first degree premeditated murder. Also charged were [the petitioner's] older brother, Christopher Hatcher ("Chris"), and [the petitioner's] friend, Cornelius Jefferson ("Cornelius"). [The petitioner] was tried individually before a jury in January 2005.

> The proof at trial established that [the petitioner], seventeen years old at the time, was released from juvenile custody on the afternoon of April 3, 2001. That evening, [the petitioner], Cornelius, and a man named Dan Smith accompanied Chris to an apartment at 756 East Raines. There, the men opened fire with multiple guns, killing Mackey and injuring Flowers and Red. [The petitioner] was arrested, and he subsequently gave a statement in December 2001 wherein he admitted to knowing "of" Red but not Mackey or Flowers. He also admitted to being present at the shooting, along with Chris, Cornelius, and Chris's "associate" Dan Smith. When asked why he was there, [the petitioner] responded as follows:

>> A: With my brother, he said he wanted me and Cornelius to come with him and said we fixing to go take care of some business.

>> Q: What did your brother mean when he said we're fixing to go take [care of] some business?

>> A: I'm assuming he was talking about killing him or doing something to him.

Q: Why was your brother Chris wanting to kill Red?

A: Because Chris said that Red tried to kill him. Chris said that someone called him on his cell phone and alerted him that Red was going to try and kill him.

When asked about weapons, [the petitioner] stated that he "and Cornelius had the shotgun and my brother Chris had a SK assault rifle. Dan had the other two which was a .38 and .25 or .22 automatic." When asked about the source of these weapons, [the petitioner] said that he did not know, but that when he arrived home from juvenile court, "Chris had the .38 on him and he had the SK outside of my mother's house in the back yard." When asked to describe the events surrounding the shooting, [the petitioner] responded as follows:

I came home that day and came in the house and that's when my brother told me that he got into it with Red. He said that Red tried to kill him, then he pulled out the .38 and said "I got this for him, if he decides to come to the house looking for me.["] I went to sleep, woke up, helped my mom bring groceries in the house. Cornelius came over, we drunk and they smoked, whatever, sit in the backyard. I stepped in the house for a minute talking to my mom and my brother came in the house and told me to come here.

So I went back to the backyard, I seen SK laying [sic] on the ground. I asked him what was it for and he said protection. So I told him I was going back in the house for a minute to talk to my mom. Then after I got through talking to her, I left. I went to the backyard, my brother was gone. I asked Cornelius where he was, he said he was gone to the Raintree to meet Dan. After that me and Cornelius walked to the store, on the way we seen my brother and Dan in the shortcut with the guns. I asked him "what's up"; he asked me "what's up". He said he was about to take care of some business. I said I was going to the store, so as we walked to the store he talked to some females, they said they were walking up to Black Store so we walked to the Black Store.

We departed from them. Went back to my house, finished drinking, smoking or whatever. We wanted some more weed so

-3-

we went and got my brother to get some weed from him. But instead of getting some weed from him, he didn't give us no weed. He was like he was fixing to go take some [sic] of some business. At that time he wanted us to go with him so we walked towards Randle's [sic] house. On the way we ran across three kids, I guess he thought one of the kids was Randle. So he walked up to him and asked who he was and the boy replied that he knew my brother then my brother pulled the S[K] up on him.

Then the boy ran behind me and I told my brother no. I don't know if he intended to shoot the boy or not but after I told him no, the boy ran. Chris continued to walk towards Randle's house. He and Dan walked to the door, knocked on the door and began to open fire. Chris ran and I assumed Dan ran in the house because I could hear a change in the shots fired. So I guess Dan realized he was by himself, so he ran.

Cornelius shot in the air as other shots were being fired. After that all of us ran together through the shortcut. Dan caught up with us and ran through the shortcut and then we went our separate ways. Me and Cornelius paid someone $10.00 to take us to a hotel on Third. We stayed there a couple of night and he left and went home. I stayed in the motel.

[The petitioner] told the police that he and Cornelius were in the "alley" between the apartment buildings when the shooting began. He said that Chris and Dan began shooting when the apartment door was opened, and that Cornelius went into the court yard area and shot the shotgun. [The petitioner] admitted that he shot the shotgun, as well, but stated that he shot it into the air. Dan took the shotgun as they were running away afterwards. He did not know where any of the guns were at the time he gave his statement.

When asked if Chris had threatened either [the petitioner] or Cornelius in order to make them accompany him, [the petitioner] responded, "He was aggressive with his words, he was like usually when he drunk and things don't go his way, and he gets upset." [The petitioner] described the shooting as "just a split second thing. It was a heat of the moment type th[i]ng." He did not learn that anyone had been killed until later, when he spoke with Cornelius and learned that Chris was "locked up."

-4-

Id. at 793-95 (footnotes omitted).

Both the petitioner's sister and mother testified that the petitioner's older brother, Chris, bullied and beat up on the petitioner and that the petitioner was afraid of him. Id. at 795-96.

On November 4, 2010, the petitioner filed a *pro se* petition for post-conviction relief. Post-conviction counsel was subsequently appointed, and an amended petition was apparently filed on January 18, 2013. The amended petition is not included in the record on appeal, but, according to the order of the post-conviction court, the petitioner alleged in the petition that "trial counsel provided ineffective assistance by failing to file an Ex Parte request for expert services by a Forensic Psychologist to support his diminished capacity defense."

At the evidentiary hearing, the petitioner testified that he was seventeen and his brother, Chris, was "about twenty" when the offenses occurred. He said he and his brother had a good relationship at the beginning of his life, but when he was about eleven or twelve years old, the relationship changed and his brother became his "worst enemy." His brother physically abused him, hitting him "like [he] wasn't his brother," and he, consequently, hated him "more than [he] hated anybody in [his] life." The petitioner stated that he lived in daily fear of his brother. His brother never actually threatened his life, but the petitioner "just always felt that bad vibe . . . that displeasure" whenever he was around him. In addition to hitting and fighting with him, his brother also fought with his mother, his little sister, and his father. In one incident, he and his brother, who had both been drinking, got into a fight over some beer and his brother hit him with a glass ornament and bit his thumb, requiring him to go to the hospital to get stitches in his head and his thumb.

The petitioner testified that his stepfather also abused him when he was growing up. He did not, however, make his defense attorneys aware of the abuse he suffered. According to the petitioner, his trial counsel never asked him about it, and he and counsel did not have the type of relationship "where [he] felt like [counsel] wanted to know th[ose] things." The petitioner further testified that trial counsel discouraged him from testifying at his trial but that he would have liked to have taken the stand to "voice [his] position on the day that incident took place" and "to admit that to some extent [he] was wrong."

On cross-examination, the petitioner testified that he had not seen the "necessity" to explain "[his] past history with [his] brother" to trial counsel. He acknowledged, however, that his sister had done so and that she had explained to the jury how his brother had treated him. He further acknowledged that he had, at times, stood up to his brother and that he had not been under his influence during the time he spent in a juvenile detention facility, from which he had been released immediately before the incident.

Trial counsel testified he had been practicing law in Tennessee for fifty years and that his practice consisted almost exclusively of criminal defense. He said he sat as second chair in the case, which had been handled by a friend who had since died. As he recalled, their defense consisted of attempting to convince the jury to convict the petitioner of a lesser-included offense to first degree murder, such as second degree murder. He vaguely recalled having requested a special jury instruction relating to the petitioner's intent to commit the crime. Although his memory was not clear on the topic, he conceded that, if the record reflected such, his request was for an instruction on diminished capacity. Trial counsel agreed that the trial court refused the special jury instruction request on the basis that there was insufficient evidence to support the instruction, ruling that the petitioner's strong fear of his brother was insufficient and that there was no evidence of the petitioner's intoxication. Trial counsel pointed out, however, that either he or lead counsel was able to argue a diminished capacity type defense to the jury. Trial counsel also agreed that the focus of his cross-examination of Sabrina Hatcher was to elicit evidence from her in support of a diminished capacity defense in the form of her testimony about the petitioner's abuse at the hands of his brother.

Trial counsel testified that he and lead counsel thoroughly discussed with the petitioner his decision about testifying. He remembered that lead counsel was adamant that the petitioner not take the stand and said that he was comfortable with that decision as they had been able to get their theory before the jury without the petitioner's testimony. Trial counsel testified that they developed their defense through the testimony of the petitioner's mother as well as through the cross-examination testimony of other witnesses. He could not recall how many witnesses they called but agreed that they did not have an expert witness in the case. He also agreed that they did not file any requests for funding for an expert witness and explained that they had not thought it necessary:

> [T]he facts in the case is at the time we were preparing it, that . . . we didn't see the relevancy of a psychiatrist coming and saying basically, you know, this . . . would go to his diminished capacity because the information that we had was just as we presented to the jury. He was afraid of his brother and that's the reason why he went over there and subconsciously from the proof in the record, we certainly had an argument for the jury to make that determination about him being afraid of his brother. That his brother would do him great bodily harm based upon what was developed in the record, but we didn't have an expert, you're right.

On cross-examination, trial counsel reiterated that he and lead counsel never considered hiring an expert because they believed that the live witness testimony they had would be the best evidence of the petitioner's relationship with his brother and the fear or

duress under which he was acting. He expressed his confidence of their having succeeded in presenting evidence of the duress the petitioner was under through the testimony of the petitioner's mother and sister about the bullying the petitioner had suffered from his brother and the fear that he felt of him.

On redirect, trial counsel acknowledged that, had they sought funds for an expert witness, the State would have paid for the services.

Geraldine Lawrence, who described herself as a "kind of stepmother" to the petitioner, testified that she had helped raise both the petitioner and his brother, Chris Hatcher. She said that Chris had a dominant personality and that the petitioner was always intimidated by him and would do things under Chris's influence that he would not have done alone.

On July 18, 2013, the post-conviction court entered an order denying the petition, finding that the petitioner failed to carry his burden of showing either a deficiency in counsel's performance or prejudice to his case. With respect to the prejudice prong, the post-conviction court cited Denton v. State, 945 S.W.2d 793, 802 (Tenn. Crim. App. 1996), and Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990), for the proposition that "'when a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing' in order to show prejudice." The court noted, however, that because "no funding is available in non-capital post-conviction cases[,] . . . post-conviction counsel [could not] be faulted by failing to present an expert witness." This appeal followed.

## ANALYSIS

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458

(Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The petitioner contends that counsel were deficient in their representation, thereby prejudicing the outcome of his case, by failing to have an expert witness provide testimony at his trial in support of his diminished capacity defense. He further contends that the post-conviction court "erred in relying on Denton v. State and Black v. State in denying [his] petition for post-conviction relief." The State disagrees, arguing that the post-conviction court properly denied the petition on the basis that the petitioner failed to meet his burden of demonstrating either a deficiency in counsel's representation or prejudice to his case. With respect to the prejudice prong, the State notes that neither our supreme court nor the federal courts have found that states are constitutionally required to provide funding for expert

witnesses in non-capital cases.

In its order denying relief, the post-conviction court engaged in a lengthy review of the case law surrounding the "strong presumption" that counsel's actions or inactions were the result of sound trial strategy rather than neglect before going on to summarize the proof at the evidentiary hearing, which included counsel's explanation that their defense was based on a claim, supported by witness testimony, that the petitioner's fear of his brother was the "diminished capacity" that prevented him from forming the requisite mens rea for the crime. The post-conviction court then noted that the petitioner failed to present an expert witness at the hearing to show what, if any, favorable and material testimony an expert would have provided at the petitioner's trial. The court concluded that without such testimony, the petitioner was unable to establish any prejudice to his case. The court further concluded that the petitioner had "failed to carry his burden of proof to establish either deficient performance or prejudice."

We conclude that the record fully supports the findings and conclusions of the post-conviction court. Trial counsel, an experienced defense attorney, explained that their defense consisted of trying to show that the petitioner's fear of his brother prevented him from forming the intent for first degree murder. He further explained that neither he nor lead counsel saw the necessity of an expert witness, as they believed that the best witnesses to testify with respect to the family dynamics and the coercive influence the petitioner's brother had over the petitioner were the family members who witnessed the abuse. The petitioner has not presented evidence to overcome the reasonableness of counsel's trial tactics and, thus, has not shown that counsel were deficient in their representation.

The petitioner has also not shown any prejudice as a result of counsel's failure to hire an expert witness. We respectfully disagree with the petitioner's contention that, due to the fact that there is no funding for expert witnesses in post-conviction proceedings, "fairness dictates that a *per se* finding of prejudice be extended" to him based on the facts of his case. As the State points out in its brief, the petitioner's counsel presented their defense through the testimony of the petitioner's mother and sister. Thus, the case is not one in which "counsel entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," leading to a finding of presumed prejudice. United States v. Cronic, 466 U.S. 648, 659 (1984).

## CONCLUSION

We conclude that the petitioner has failed to establish that counsel were deficient or that he suffered any prejudice as a result of counsel's alleged deficiencies in representation.

Accordingly, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE